IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Michael Harmon, #96127-071, ) | Civil Action No. 6:06-1143-GRA-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Warden J. J. LaManna, Edgefield; ) | |
| Clinical Director, J. Serrano, M.D.; ) | |
| Staff Physician, R. Blacker, M.D.; ) | |
| Health Services Administrator, Mrs. ) | |
| Rosario; and Physician Assistant, ) | |
| L. Guevara, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

The plaintiff, a federal prisoner proceeding *pro se*, seeks relief pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The defendants filed a motion for summary judgment on July 24, 2006. By order filed July 25, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. On September 11, 2006, the plaintiff filed a response to the motion.

## **FACTS PRESENTED**

The plaintiff was sentenced on August 30, 2000, to a 148-month term of incarceration in the United States District Court for the District of South Carolina for Armed Bank Robbery (18 U.S.C. § 2113(a)(D)), Aiding and Abetting (18 U.S.C. § 2), and Use of a Firearm in Relation to a Crime (18 U.S.C. § 924(c)(1)(A)).  He is currently incarcerated at the Federal Correctional Institution ("FCI") at Edgefield, South Carolina, and has a projected release date of June 6, 2011, via Good Conduct Time ("GCT") release.

The plaintiff has named as defendants John J. LaManna, Warden, FCI Edgefield; Jose Serrano, M.D., Clinical Director, FCI Edgefield; Rex Blocker, M.D., Staff Physician, FCI Edgefield; Luisa Rosario, Health Services Administrator, FCI Edgefield; and Lorenzo Guevara, Assistant Health Services Administrator, FCI Edgefield.  He alleges the defendants intentionally, recklessly, and negligently delayed and failed to provide proper medical care in violation of his Eighth and Fourteenth Amendment rights.  Specifically, he alleges he had been prescribed anti-inflammatory eyedrops for treatment of a right eye injury.  He states on or about September 13, 2004, he was taken off all anti-inflammatory eyedrops for a period of 12 days without the consent of the eye specialist who was treating him.  The plaintiff alleges that because he was erroneously taken off the eyedrops for 12 days he had to undergo emergency surgery.  He also alleges during the 12-day period the defendants ignored his pleas to be put back on the medication and ignored his complaints of pain and suffering.  He contends that he now suffers from irreversible eye distortion, lazy eye, and nearsightedness.  As relief, the plaintiff asks the court to award him compensatory damages of $2,000,000 jointly and severally from all defendants, and punitive damages of $500,000 from all the defendants.

The facts with regard to the plaintiff's medical claim are as follows.  On July 31, 2004, the plaintiff reported to the FCI Edgefield Health Services Unit ("HSU") indicating he had been poked in the right eye while playing basketball.  Medical staff

2

examined his right eye which revealed he had positive vision and could see fingers held out in front of him.  The plaintiff was diagnosed with a corneal abrasion.  He was provided with an eye patch and Sulfacetamide Ophthalmic Solution (def. m.s.j., ex.1, p. 000001).

On August 2, 2004, the plaintiff was examined by FCI Edgefield medical staff during a follow-up appointment for his eye injury.  He denied any pain or other discomfort at this visit.  After consultation with the staff physician, it was recommended that the plaintiff be examined by an ophthalmologist.  He was provided with an ice compress and Ibuprofen (*id.* at pp. 000002-000003).  On this same day, the plaintiff was examined by the contract optometrist, who diagnosed him with traumatic iritis.  The optometrist noted the plaintiff had elevated intraocular pressure ("IOP") in the right eye.  The optometrist recommended transporting the plaintiff to the local hospital to be examined by an ophthalmologist (*id.* at p. 000068).

Later that same day, the plaintiff was transported to the local hospital and examined by a consultant ophthalmologist.  He was diagnosed with traumatic glaucoma with secondary iritis of the right eye.  The ophthalmologist indicated the piece of equipment needed for further evaluation was not working so the plaintiff needed to be seen again the next day (*id.* at p. 000069).

Pursuant to the ophthalmologist's directive, on August 3, 2004, the plaintiff was transported to the consultant ophthalmologist's office for further examination and treatment.  The ophthalmologist prescribed Diamox, Timoptic Opthalmic Solution, Xalatan, Alphagan, Pred Forte 1%, and Homatropine Ophthalmic Solution.  The ophthalmologist also recommended the plaintiff be kept on constant bed rest, and a follow-up appointment be scheduled for the next day (*id.* at pp. 000004, 000070-000073).

On August 4, 2004, the plaintiff was examined by the contract optometrist. The optometrist noted the plaintiff still had elevated IOP in his right eye, and that he had not picked up his medications prescribed the day before.  The plaintiff was instructed to take

3

the medication as prescribed and hourly pressure checks were ordered (*Id.* at p. 000074). On this same day, the plaintiff was also examined by the consultant ophthalmologist. The ophthalmologist recommended the plaintiff continue the ordered medications and that a sickle cell trait laboratory test be conducted (*id*. at pp. 000006, 000075).

On August 5, 2004, the consultant ophthalmologist contacted FCI Edgefield medical staff by telephone to indicate that the future management of the plaintiff's right eye would depend on the response to the eyedrops. The ophthalmologist also indicated the plaintiff needed to be seen as he instructed since at any moment he might worsen and treatment regimen might have to change. The ophthalmologist also requested the sickle cell trait test results be available during his next appointment on August 6, 2004 (*id.* at p. 000007).

On August 6, 2004, the plaintiff was examined by the consultant ophthalmologist. The ophthalmologist indicated the plaintiff was being treated for elevated IOP of the right eye. The ophthalmologist prescribed refills of Pred Forte, Diomox, Timoptic, Xalatan, and Alphagan. The ophthalmologist also indicated if the plaintiff's condition was still unchanged after the next appointment, referral to a retinal specialist might be necessary. The ophthalmologist requested a follow-up appointment for Monday, August 9, 2004. The sickle cell test performed on this day returned with a negative result (*id.* at p. 000007, 000076-000077).

On August 9, 2004, the plaintiff was seen by FCI Edgefield medical staff for a request of refills of his medications. He stated his right eye was getting better and the redness was decreased. The FCI Edgefield staff physician contacted the contract ophthalmologist because the plaintiff's appointment for that day could not be made. The ophthalmologist directed FCI Edgefield medical staff to continue current medications until a new appointment was made (*id.* at p. 000008).

On August 11, 2004, the plaintiff was examined by the contract optometrist. The optometrist recommended continuing all eyedrops as prescribed and decrease Diamox. The plaintiff was instructed to return to the clinic in two days (*id.* at pp. 000009, 000078). On August 12, 2004, the plaintiff was examined by the contract optometrist. In addition to the directions given the previous day, the optometrist recommended the plaintiff wear sunglasses when outdoors, measure IOP daily, and follow up on August 18, 2004 (*id.* at pp. 000010, 000079).

On August 18, 2004, the plaintiff was seen by the consultant ophthalmologist/ glaucoma specialist at a local hospital eye clinic. The ophthalmologist indicated the plaintiff was suffering from angle recession with secondary glaucoma and traumatic iridoplegia. The ophthalmologist recommended the following treatment: discontinue Xalatan, continue Timoptic, increase Alphagan, discontinue Pred Forte and replace with FML Forte, increase Diamox, discontinue Homatropine and replace with Atropine Ophthalmic Solution, add Acular Ophthalmic Solution, and wear sunglasses at all times. The plaintiff was directed to alternate using the Acular with FML Forte. A follow-up appointment was set for Friday, August 20, 2004. Upon the plaintiff's return to the institution, it was noted Acular was not available so it was replaced with Ketorolac (*id.* at pp. 000012, 000080-000085).

On August 20, 2004, the plaintiff was seen by the consultant ophthalmologist at the local eye clinic. The ophthalmologist indicated the plaintiff had elevated IOP, traumatic glaucoma, and increased right eye inflammation. The ophthalmologist recommended discontinuing Timoptic and replace with Cosopt Ophthalmic Solution, continue Alphagan, Atropine, Acular, and Diamox, discontinue FML Forte and replace with Pred Forte, and requested a follow-up appointment for August 24, 2004 (*id.* at pp. 000014-000015, 000086-000089).

On August 25, 2004, the plaintiff was seen by the consultant ophthalmologist at the local eye clinic. The ophthalmologist recommended he discontinue Acular or its

substitute and continue remaining medications.  A follow-up appointment was set for two weeks (*id.* at pp. 000015, 000090-000091).  On August 26, 2004, the plaintiff was examined by FCI Edgefield medical staff.  He stated he was feeling much better, and the consultant talked about cataracts.  He was instructed to discontinue taking Ketorolac but continue with the remaining prescribed medications (*id.* at pp.000016-000017).

On August 30, 2004, the plaintiff was examined by the contract optometrist. The optometrist instructed the plaintiff to return to clinic as needed or to be seen by specialist (*id.* at p. 000092).

On September 13, 2004, the plaintiff was examined by FCI Edgefield medical staff.  The plaintiff admitted that he had not taken the Diamox that day.  He stated he had been using the eyedrops, but his IOP was elevated at 52 mm Hg.  Dr. Serrano indicated he reviewed the medications prescribed by the ophthalmologist and directed the plaintiff to discontinue the Pred Forte, discontinue Diclofenec, and continue Alphegan, Diamox, and Dorzolamide (*id.* at pp. 000018-000019).

On September 14, 2004, the plaintiff was seen by FCI Edgefield medical staff. At the time, the plaintiff's IOP in his right eye ranged from 49-51 mm Hg (*id.* at p. 000019). On September 15, 2004, the plaintiff was again seen by FCI Edgefield staff and was given Ibuprofen for pain relief (*id.* at p. 000020).  On September 16, 2004, the plaintiff was seen by the medical staff for headache, dizziness, and numbness in his face (*id.* at pp. 000022-000023).

On September 22, 2004, the plaintiff was examined by the contract optometrist.  The optometrist indicated the plaintiff's IOP was still elevated and to continue current medications (*id.* at p. 000093).

On September 23, 2004, the plaintiff asked defendant Guevara about whether or not he had been assigned a medical duty status to wear sunglasses, and Mr. Guevara informed the plaintiff that he had (*id.* at p. 000024).

6

On September 24, 2004, the plaintiff was examined by the consultant ophthalmologist at the local eye clinic. The ophthalmologist recommended restarting Pred Forte 1% , Cosopt, Alphagan, Atropine, and increasing Diamox. The doctor noted that the plaintiff "should not be taken off" the Pred Forte 1%. The plaintiff's IOP at that examination was 47 mm Hg, and the ophthalmologist noted that the plaintiff stated his IOP levels were in the 50s during the prior week. The ophthalmologist also noted the plaintiff's diagnosis was recession glaucoma with predistal/recurrent iritis, the IOP is currently unacceptable, he may need surgical correction, and he requested a follow-up in one week (*id.* at pp. 000025, 000094-000095).

On October 5, 2004, the plaintiff was seen by the contract optometrist. The optometrist recommended continuing current medications and return to clinic in one month (*id.* at p. 000096). On October 8, 2004, the plaintiff was seen by the consultant ophthalmologist at the local eye clinic. It was noted the uveitis improved but was still present and IOP still elevated at 58 mm Hg. The ophthalmologist recommended continuing the current eyedrops and adding Xalatan. The ophthalmologist also recommended a trabeculectomy be performed to preserve the plaintiff's vision (*id.* at pp. 000097-000098).

On October 13, 2004, the plaintiff was seen by the consultant ophthalmologist for a preoperative examination. At this time, his IOP was still severely elevated (*id.* at p. 000099). On October 14, 2004, a trabeculectomy was performed by the consultant ophthalmologist at the local hospital. Post surgery recommendations were use of Cipro Ophthalmic, Pred Forte, and Atropine (*id.* at pp. 000032 & 000100-000104). Subsequent to the trabeculectomy, the plaintiff has received several follow-up examinations from the consultant ophthalmologist and the consultant optometrist (*id.* at pp. 000105-000133). He has also been closely monitored by FCI Edgefield medical staff (*id.* at pp. 000032-000067).

The plaintiff alleges that on September 13, 2004, defendant Dr. Serrano took him off of the prescription Pred Forte eyedrops, and because of this his IOP went to

7

dangerously high levels, which resulted in emergency surgery on October 14, 2004 (comp. ¶¶ 13-18). The defendants submitted the declarations of Dr. Serrano and Dr. Blocker in support of their motion for summary judgment (def. m.s.j., ex. 3, 4). Drs. Serrano and Blocker testified as follows:

> On or about September 13, 2004, [Dr. Serrano] noted to discontinue the Pred Forte because on August 18, 2004, the consultant ophthalmologist had recommended changing the Pred Forte to FML Forte. Because FCI Edgefield does not carry FML Forte [Dr. Serrano] decided to continue using Pred Forte but decreased the action strength to that of FML Forte. However, Mr. Harmon had received a prescription for Pred Forte on August 19, 2004, in an amount that did not need to be refilled until November 16, 2004. Thus, he was still in possession of and had use of Pred Forte subsequent to September 13, 2004. In addition, contrary to [the plaintiff's] allegation, the medical record clearly shows [Dr. Serrano] did not discontinue all of the eyedrops he had been prescribed. On September 13, 2004, [Dr. Serrano] provided [the plaintiff] with prescriptions for Alphegan, Diamox, and Dorzolamide.

(Serrano dec. ¶3; Blocker dec. ¶3).

Drs. Serrano and Blocker further testified that the alleged discontinuation of the Pred Forte for 12 days did not cause the plaintiff to have to undergo the trabeculectomy eye surgery. They testified that the plaintiff had been treated with anti-inflammatory topical steroids and other anti-inflammatory ophthalmic eyedrops for a period of 61 days, and despite the use of these medications, the plaintiff's IOP level in his right eye did not decrease. Therefore, the consultant ophthalmologist decided to perform a trabeculectomy, which is indicated when glaucoma continues to progress despite the use of medications (Serrano dec. ¶ 4; Blocker dec. ¶ 4). The plaintiff's IOP was 52 mm Hg on September 13, 2004, and 47 mm Hg on September 24, 2004 (def. m.s.j., ex.1, p. 000018; ex. 2, p. 000094) (*see* Gokhale dec. ¶ 4) (testifying that average IOP is 16 mm Hg). Drs. Serrano and Blocker testified that during the 12-day period at issue, the plaintiff did not approach them with complaints of not receiving proper medical care for his right eye injury (Serrano dec.

8

¶ 5 ; Blocker dec. ¶ 5).  Further, defendant Luisa Rosario, the Health Services Administrator at FCI Edgefield, submitted a declaration in which she stated that she did not recall the plaintiff ever approaching her with complaints regarding his eyedrops or that he was in pain and was being refused medical care (Rosario dec. ¶ 3).  Lorenzo Guevara, the Assistant Health Services Administrator at FCI Edgefield, testified that on September 23, 2004, the plaintiff approached him and asked whether or not he had been assigned a medical duty status to wear sunglasses, and he informed the plaintiff that he had.  During that encounter, the plaintiff had no complaints about his medical care and did not indicate that he was experiencing any pain because his eyedrops had been discontinued (Guevara dec. ¶ 3; medical record at p. 000024).

The consultant ophthalmologist, Dr. Parag A. Gokhale, submitted a declaration in which he testified:

> At the time of the surgical decision in October of 2004, the patient was on maximally tolerated medical therapy including anti-inflammatory medicine (prednisolone Acetate), cycloplegic medicine, and intraocular pressure lowering medications.  The pressure was uncontrolled on this therapy.  A trabeculectomy was therefore performed on October 14, 2004, in order to lower the intraocular pressure.

(Gokhale dec. ¶ 9).  He further testified that at the plaintiff's last evaluation on January 7, 2005, his IOP  was 12 mm Hg (Gokhale dec. ¶¶ 10).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

10

The defendants first argue that this court lacks subject matter jurisdiction over the plaintiff's claims against them in their official capacities. This court agrees. Section 1983 allows a civil action to recover damages for deprivation of a constitutionally protected right. *Bivens,* 403 U.S. at 395-96. However, a suit against a federal agency or federal officer in his or her official capacity is actually a claim against the United States. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989). Such a suit lies only where the United States has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). The United States has not waived its sovereign immunity for constitutional misconduct. *See id.* at 477-78. Accordingly, the doctrine of sovereign immunity shields the United States from suit absent its consent to be sued. Therefore, this court lacks jurisdiction over the plaintiff's claims against the individual defendants in their official capacities, and those claims should be dismissed.

The plaintiff's claims fail on the merits. He first alleges that the defendants were deliberately indifferent to his medical needs. Deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. § 1983 as constituting cruel and unusual punishment contravening the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Id.* at 102. This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical services. *Id.* The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Rogers v. Evans*, 792 F.2d

1052, 1058 (5th Cir. 1986). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

In order to establish that he has been subjected to cruel and unusual punishment, the plaintiff must prove that the deprivation of a basic human need was, objectively, sufficiently serious, and that, subjectively, the officials acted with a sufficiently culpable state of mind. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). What suffices as a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Courts have traditionally attempted to avoid intervening and dictating the medical care of prisoners. As noted by the Fourth Circuit, courts should "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. . . .[which] remains a question of sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

With respect to the subjective component of deliberate indifference, while an "express intent to inflict unnecessary pain is not required . . . [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishment clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Mere disagreement between an inmate and a physician over the appropriate form of treatment is not an actionable constitutional claim. *Wright v. Collins*, 766 F2d 841, 849 (4th Cir. 1975).

Clearly, the plaintiff's eye injury is a serious medical need. However, the plaintiff has failed to provide any evidence that the defendants were deliberately indifferent to that need and that he suffered any injury as a result of the defendants' actions. Accordingly, the claim fails. Furthermore, as argued by the defendants, the plaintiff alleges, at most, that the defendants were negligent. Even if the plaintiff could prove that the

12

defendants were negligent, mere negligence does not constitute a constitutional violation. *Grayson*, 195 F.3d at 695 ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it.").

The defendants further claim that they are entitled to qualified immunity. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights. Therefore, the defendants are entitled to qualified immunity.

The plaintiff also alleges that he is stating a claim pursuant to the Federal Tort Claims Act ("FTCA"). Title 28, United States Code, Section 1346(b)(1) provides exclusive jurisdiction to hear actions against the United States for money damages "for injury to or loss of property, or personal injury or death caused by a negligent wrongful act or omission of any federal employee while acting within the scope of his office or employment . . . ." In a claim pursuant to 28 U.S.C. § 1346(b)(1), the only proper party defendant is the United States of America. Pursuant to 28 U.S.C. § 2679, suits against a federal agency on claims which are cognizable under 28 U.S.C. § 1346(b) are not authorized. Therefore, the defendant requests that the individual defendants be dismissed and replaced with the United States of America as the defendant as to this claim. This court agrees. The defendants concede that the plaintiff has exhausted his remedies as to this claim.

The defendants argue that the plaintiff's allegations fail to state a claim under the FTCA. Under the FTCA, the court must determine whether the United States is subject to tort liability by applying the substantive law of the state where the act or omission occurred. 28 U.S.C. §1346(b)(1). In South Carolina, a plaintiff alleging a medical malpractice claim must proved by a preponderance of the evidence the following:

> (a)    The recognized and generally accepted standards, practices, and procedures in the community which would be exercised by competent physicians in the same speciality under similar circumstances;
>
> (b)    that the physician or medical personnel negligently deviated from the generally accepted standards, practices, and procedures;
>
> (c)    that such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury; and
>
> (d)    that the plaintiff was injured.

*Dumont v. United States*, 80 F.Supp.2d 576, 581 (D.S.C. 2000) (internal citations omitted). Furthermore, a plaintiff must establish by expert testimony both the "standard of care and

14

the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct." *Martasin v. Hilton Head Health System, L.P.,* 613 S.E.2d 795, 799-800 (S.C. Ct. App. 2005) (citing *Gooding v. St. Francis Xavier Hosp.*, 487 S.E.2d 596, 599 (S.C. 1997)).

The plaintiff has failed to establish, and the record does not reflect, that the subject matter is of such common knowledge or experience so that no special learning is needed to evaluate the defendants' conduct. Accordingly, he is not relieved of the requirement to provide expert testimony in support of his claim. The evidence before the court shows that the plaintiff was on maximally tolerated medical therapy including anti-inflammatory medicine, cycloplegic medicine, and intraocular pressure lowering medication; however, the intraocular pressure was uncontrolled on this therapy and a trabeculectomy was therefore performed (Gokhale dec. ¶ 9). The plaintiff has failed to show that the defendants' conduct was a proximate cause of his injury. Based upon the foregoing, the claim fails.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted.

January 24, 2007

Greenville, South Carolina

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

15